NOT FOR PUBLICATION

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHERESE M. B.,<br><br>                Plaintiff,<br><br>      v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                Defendant. | Civil Action No.: 20-17718<br><br>**OPINION** |

**CECCHI, District Judge.**

## I.    INTRODUCTION

Before the Court is the appeal of Cherese M. B.[1] ("Plaintiff") seeking review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act ("SSA"). ECF No. 1; *see also* ECF No. 11 ("Pl. Br."). The Commissioner opposed the appeal. ECF No. 14 ("Opp."). This matter is decided without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons set forth below, the decision of the Administrative Law Judge ("ALJ") is affirmed.

## II.    BACKGROUND

Plaintiff is a 51-year-old with a high school education and one year of college. ECF No. 7 ("Tr.") at 44, 226. Before applying for DIB, she worked as a cook. *Id.* at 44. Plaintiff explained she was "[f]ired" in January 2017 because her "conditions prevented [her] from being able to

---

[1] Pursuant to District of New Jersey standing order 2021-10, "any non-governmental party will be identified and referenced solely by first name and last initial" due to privacy concerns present in social security cases. D.N.J. Standing Order 2021-10; *see also Bryan S. v. Kijakazi*, No. 20-cv-11145, 2022 WL 2916072, at *1 n.1 (D.N.J. July 25, 2022).

work," and because of her "poor job performance." *Id.* at 50, 226, 416. Plaintiff contends that, for the period of alleged disability, she was unable to work as a result of: obesity, an overactive adrenal gland, scoliosis, disc herniation, right knee arthritis, inflammatory arthritis, hypertension, asthma, depression, anxiety, post-traumatic stress disorder ("PTSD"), and a learning disability. *Id.* at 93, 203–09.

Although Plaintiff claimed her back and knee conditions prevented her from certain physical movements such as walking, climbing, and bending, she was able to bathe and get dressed, get her three children dressed, take them to school, and perform chores. *Id.* at 243, 248, 250. She states she could not stand for long, however, she prepared meals and snacks daily (spending at least two hours doing so), drove herself places, ironed, did laundry, and went shopping. *Id.* at 245–46. As for any claimed mental impairments, she nonetheless was able to engage in hobbies including playing word games, sewing, reading, writing, and watching television, and was able to help her children with their homework. *Id.* at 246–47, 250. While she expressed difficulties with others because they did not understand why she was unable to do things she used to do, Plaintiff went to the park or out for dinner weekly and acknowledged getting along with people in authority. *Id.* at 247–49. Plaintiff was also able to pay attention for long periods of time, finish what she started, and follow written and spoken instructions. *Id.* at 248.

A.  **Physical Treatment**

In February 2017, Plaintiff sought treatment for right knee pain from a motor vehicle accident 20 years earlier. *Id.* at 396. An examination showed a small effusion, "a little bit of joint line tenderness," no unusual ligamentous laxity, and an adequate range of motion. *Id.* X-rays showed mild medial joint space narrowing in both knees and a small tilt in the patella, but "really not very much and not a whole lot of arthritic changes." *Id.* Plaintiff was treated with a knee injection. *Id.* She also complained of lower back pain, sometimes radiating into the left buttock,

but had no motor loss and her orthopedist observed that lumbar spine x-rays looked "pretty much normal." *Id.*

Plaintiff returned to the doctor approximately one week later with numbness in her arms when sleeping and increased lower back pain. *Id.* at 398. However, an examination revealed she was in no apparent distress, had "slightly limited range of motion in trunk flexion, extension, and side bending" but full strength in the lower extremities, intact sensation, negative straight leg-rising, and appropriate mood and affect. *Id.* She was diagnosed with lumbago with sciatica, prescribed anti-inflammatory medication, and referred for physical therapy. *Id.* at 399. In March 2017, an MRI of Plaintiff's knee showed a "torn anterior horn lateral meniscus and a lateral facet chondromalacia of the patella," for which the orthopedist planned arthroscopic surgery. *Id.* at 401, 409. On March 13, 2017, Plaintiff was given a new prescription for physical therapy and a home exercise program. *Id.* at 403. On March 22, 2017, an electrodiagnostic study of the right arm was found to be "most consistent with right chronic C8, T1 radiculopathy." *Id.* at 404–07.

Plaintiff returned to her orthopedist on April 13, 2017 with complaints of neck and back pain, but she had not yet started physical therapy and her examination was largely unchanged. *Id.* at 443. On June 2, 2017, Plaintiff reported that physical therapy was helping, but her insurance would not approve additional sessions. *Id.* at 472. Plaintiff received a knee x-ray on June 9, 2017, which displayed "[m]ild to moderate joint effusion" and "[m]ild degenerative changes." *Id.* at 482–83. On December 29, 2017, Plaintiff had a follow up visit with the orthopedist, noting her severe knee pain and worsening symptoms. *Id.* at 539. She reported there had been no change in the symptoms with "heat, medication, chiropractic therapy, physical therapy, home exercise program and injection." *Id.*

In January 2018, Plaintiff underwent right knee surgery. *Id.* at 561, 564–65, 596–97. After surgery, she was prescribed physical therapy and given a note to stay out of work for a month. *Id.*

3

at 542.  Her orthopedist stated: "I know that she essentially need[s] two months of therapy, but I think we should really get her back to work in one month."  *Id.*

At visits in February 2018, Plaintiff reported no improvement with pain that affected her daily routine, but also that her "symptoms ha[d] improved with physical therapy, bracing and [a] TENS unit."  *Id.* at 543–49.  On February 5, 2018, an MRI of the cervical spine showed degenerative disc changes and suggested a cystic nodule within the right lobe of the thyroid gland.  *Id.* at 559–60.  On February 21, 2018, Plaintiff reported no problems after her knee surgery and that her symptoms had been "steadily improving over the last few weeks."  *Id.* at 550.  However, Plaintiff continued to have some pain over the lateral aspect of the knee and with flexion and extension.  *Id.*  The physician assistant described that Plaintiff appeared to be doing well, her overall function had improved, and she was "independently ambulating without difficulty."  *Id.*  Plaintiff was encouraged to increase her activity as comfort dictated, continue with physical therapy, and return in four weeks.  *Id.*

At a return visit on March 1, 2018, Plaintiff was having somewhat less knee pain.  *Id.* at 552.  The doctor estimated that Plaintiff could return to work in about two to three months.  *Id.*  Plaintiff was given injections in April 2018, which were helpful, and Plaintiff was given a note stating that she could return to work on approximately April 30, 2018.  *Id.* at 554–56.

B. **Mental Health and Psychiatric Treatment**

Plaintiff underwent outpatient mental health treatment from January 2017 through September 2017 (*id.* at 412–40, 520–30, 603) and from February 2019 to April 2019 (*id.* at 603–15).  In January 2017, she reported having "anxiety attacks, stress, [and] symptoms of depression."  *Id.* at 413.  She described feeling overworked, and "having relationship issues with her husband and children."  *Id.*  Plaintiff also complained of lack of sleep, a decreased appetite, crying spells, isolating herself, and "an increase in anger and aggression" towards her husband following a

4

history of abuse. *Id.* at 413, 417. She stated that symptoms began when her infant son passed away in 2006. *Id.* at 413, 416. Plaintiff indicated that she had a desire to return to school to complete a degree, but was unsure what to study. *Id.* at 416. A mental status examination showed pressured speech but a cooperative attitude, good eye contact, a calm mood, appropriate affect, no memory impairment or perceptual distortions, a relevant and logical thought process, and intellectual insight. *Id.* at 417–18.

At a psychiatric evaluation in March 2017, Plaintiff's main complaint was depression. *Id.* at 420. She was diagnosed with major depressive disorder (recurrent with anxious distress) and PTSD, prescribed Paxil and Vistaril, and recommended for therapy. *Id.* at 422–23. Plaintiff returned in July, August, and September 2017 for medication management. *Id.* at 523–30. Plaintiff's mental status examinations were largely unchanged, other than feelings of sadness in part due to her cousin's murder, with a low mood and sad affect, but a calm demeanor, good eye contact, linear and coherent thoughts, and fair insight and judgment. *Id.* at 523, 525, 528. In March 2019, Plaintiff reported she was "doing good" on her medications and wanted to continue them, and that she was participating in a work program full time. *Id.* at 609, 613.

C.   **Consultative Examinations and State Agency Medical Expert Findings**

On June 29, 2017, Ronald G. Silikovitz, Ph.D., performed a consultative evaluation of Plaintiff. *Id.* at 514–18. Plaintiff reported mental diagnoses of anxiety, PTSD, depression, and learning problems. *Id.* at 516. She explained many of these issues began when she was removed from her mother's care because of abuse. *Id.* She reported symptoms of low motivation and alienation. *Id.* During the mental status examination, she identified the President and the Governor and was able to repeat a five-digit sequence forward and a four-digit sequence backward. *Id.* On a serial sevens task requiring her to subtract successively by sevens from 100, she made several errors. *Id.* However, she was cooperative and spoke in depth about her daily routine and care for

5

her children. *Id.* at 516–17.  She reported, for example, that she managed her personal hygiene, woke up her children, prepared breakfast, attended to her children's clothing and hair, took them to school, performed household chores, attended appointments, read, watched television, helped her children with their homework, made sure they were bathed and went to bed, and reviewed her schedule for the next day. *Id.* at 517.  When describing how she cared for her children, Plaintiff stated, "I oversee everything." *Id.*  She also reported she was dating and had a boyfriend. *Id.*  Dr. Silikovitz diagnosed Plaintiff with PTSD (chronic), major depression (recurrent, moderate), adjustment disorder with anxiety, and a learning disability, but concluded she was capable of managing her benefits. *Id.*

In May 2017 and December 2017, respectively, Deogracias Bustos and Raymond Briski, state agency medical consultants, reviewed the record and found Plaintiff capable of light work with postural and environmental limitations.  *Id.* at 98–100, 116–18.  In July 2017 and November 2017, respectively, Robert Eckardt and Sharon Flaherty, state agency psychological consultants, reviewed the record and found Plaintiff was able to understand, remember, and execute simple instructions; had the requisite concentration, persistence, or pace to complete tasks in a timely manner; and could adapt to change and adjust to supervision in environments where emotional demands were moderate. *Id.* at 100–02, 118–20.

### D.     Procedural History

In April 2017, Plaintiff filed an application for DIB, alleging disability as of January 4, 2017.  *Id.* at 93.  Plaintiff's claim was denied initially and upon reconsideration.  *Id.* at 91–122.  The ALJ held a hearing on April 2, 2019, at which Plaintiff, represented by counsel, and a vocational expert, testified.  *Id.* at 36–90.  In a decision dated September 12, 2019, the ALJ found Plaintiff not disabled.  *Id.* at 16–29.  The Social Security Administration's Appeals Council

denied Plaintiff's request for review, which rendered the ALJ's decision final. *Id.* at 1–6. This appeal followed.

### III.  LEGAL STANDARD

#### A.  Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. §§ 405(g), 1383(c)(3). The Court is not "permitted to re-weigh the evidence or impose [its] own factual determinations," but must give deference to the administrative findings. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011); *see also* 42 U.S.C. § 405(g). Nevertheless, the Court must "scrutinize the record as a whole to determine whether the conclusions reached are rational" and corroborated by substantial evidence. *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (internal quotation marks and citation omitted). Substantial evidence is more than a mere scintilla and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Chandler*, 667 F.3d at 359 (internal quotation marks and citation omitted). If the factual record is adequately developed, substantial evidence "may be 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). In other words, under this deferential standard of review, the Court may not set aside the ALJ's decision merely because it would have come to a different conclusion. *See Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x 475, 479 (3d Cir. 2007).

#### B.  Determining Disability

In order to be eligible for benefits under the SSA, a claimant must show she is disabled by demonstrating an inability to "engage in any substantial gainful activity by reason of any medically

7

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled for SSA purposes only if her physical or mental impairments are "of such severity that [s]he is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

Decisions regarding disability are made individually and will be "based on evidence adduced at a hearing." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000) (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)).  Congress has established the type of evidence necessary to prove the existence of a disabling impairment by defining a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

### C. Sequential Evaluation Process For A Continuing Disability

The Social Security Administration follows a five-step, sequential evaluation to determine whether a claimant is disabled under the SSA.  20 C.F.R. §§ 404.1520, 416.920.

First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  *Sykes*, 228 F.3d at 262.  Second, if the claimant is not engaged in such activity, the ALJ determines whether the claimant has any impairments severe enough to limit her ability to work.  *Id.*  Third, if she has any severe impairments, the ALJ considers the medical evidence to determine whether the impairment or combination of impairments is included in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  If the claimant's impairment(s) medically equal one of the Listings, this results in a presumption of disability.  *Sykes*, 228 F.3d at 262.  If the impairment is not in the Listings, the ALJ must determine how much residual functional capacity

("RFC") the applicant retains despite her impairment. *Id.* at 263. Fourth, the ALJ must consider whether the claimant's RFC is adequate to perform her past relevant work. *Id.* Fifth, if her RFC is not sufficient to perform past work, the ALJ must determine whether there is other work in the national economy the claimant can perform. *Id.*

The evaluation continues through each step unless it is ascertained at any point the claimant is or is not disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the ultimate burden of establishing steps one through four of this test. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019). The burden shifts to the Commissioner at step five to prove that the claimant can perform a job that exists in the national economy. *Ramirez v. Barnhart*, 372 F.3d 546, 555 (3d Cir. 2004).

## IV.   DISCUSSION

### A.   Summary of the ALJ's Decision

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 4, 2017, the alleged onset date. Tr. at 18. At step two, the ALJ found Plaintiff had the following severe impairments: cervical degenerative disc disease with radiculopathy; thoracic degenerative disc disease; lumbago with sciatica and scoliosis; lateral facet chondromalacia and subluxation of the patella of the right knee, status post-surgery; asthma; chronic obstructive pulmonary disease ("COPD"); obesity; PTSD; major depression; adjustment disorder with anxiety; and a learning disorder. *Id.* at 19. At this step, the ALJ noted that these impairments were severe because they "significantly limit the ability to perform basic work activities as required by SSR 85-28." *Id.* At step three, the ALJ determined that Plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the Listings. *Id.* at 19–23. Because the ALJ found that Plaintiff's impairments did not equal an

9

impairment enumerated in the Listings, the ALJ then formulated Plaintiff's RFC. *Id.* at 23–27. Based on all the evidence in the record, the ALJ assessed an RFC for:

> sedentary work as defined in 20 C.F.R. 404.1567(a), except she can climb ramps and stairs occasionally but never ladders, ropes, or scaffolds. She can perform occasional balancing, stooping, kneeling, crouching, and crawling. She can tolerate occasional exposure but never concentrated exposure to extreme cold or heat, wetness, humidity, and to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. She could frequently use the dominant right hand for handling, fingering, and feeling. She can understand, remember and carry out simple instructions. She can perform simple, routine tasks. She can make simple work-related decisions. She is able to adapt to changes in routine work settings. She is able to have occasional interaction with coworkers and supervisors, beyond any increased interactions initially required to learn the job, and occasional interaction with the public.

*Id.* at 23. At step four, the ALJ determined Plaintiff is unable to perform any past relevant work because the "exertional requirements of the claimant's past work exceed her current [RFC]." *Id.* at 27. At step five, based on the testimony of the vocational expert (*id.* at 76–88), Plaintiff's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.* at 28. Accordingly, the ALJ found Plaintiff was not disabled during the relevant period. *Id.* at 28–29.

### B. Plaintiff's Arguments on Appeal

In the instant appeal, Plaintiff first argues that the ALJ erred by not meaningfully considering Plaintiff's obesity at each step of the sequential evaluation. Pl. Br. at 6–21. Second, Plaintiff contends that the consideration of Plaintiff's mental impairments was not based on substantial evidence. *Id.* at 21–28. Third, Plaintiff asserts that the ALJ failed to properly explain the RFC. *Id.* at 28–38.

#### 1. The ALJ's Assessment of Plaintiff's Obesity

Turning first to Plaintiff's challenge of the ALJ's consideration of Plaintiff's obesity, the Third Circuit has held that "an ALJ must meaningfully consider the effect of a claimant's obesity,

individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). In assessing the impact of a plaintiff's obesity, the ALJ must discuss the evidence and explain his reasoning in a manner that would be "sufficient to enable meaningful judicial review." *Id.*

Here, the Court finds that the ALJ adequately considered the Plaintiff's obesity. Plaintiff did not list obesity as a condition that limited her ability to work and did not identify obesity as a condition affecting her functioning in the Adult Function Report. Tr. at 93, 225, 248. Nonetheless, to the benefit of Plaintiff, the ALJ determined that Plaintiff's obesity was a severe impairment at step two. *See id.* at 19. When conducting the medical equivalency analysis at step three, the ALJ found that Plaintiff's impairments, either considered alone or *in combination*, did not equal the severity of an impairment in the Listings. *Id.* The ALJ explained:

> The claimant's obesity, while not stated by any physician to be disabling, was considered in terms of its possible effects on claimant's ability to work and ability to perform activities of daily living. Although obesity is no longer a listed impairment, SSR 19-2p provides important guidance on evaluating obesity in adult and child disability claims. I am required to consider obesity in determining whether a claimant has medically determinable impairments that are severe, whether those impairments meet or equal any listing, and determining the claimant's residual functional capacity.

*Id.* at 19–20. The ALJ concluded: "I have earlier found claimant's obesity to be severe, but the signs, symptoms and laboratory findings of [claimant's] obesity are not of such severity as found in any listing." *Id.* Accordingly, this Court finds that the ALJ appropriately considered Plaintiff's obesity as part of the medical equivalency analysis at step three. *See Morris v. Comm'r of Soc. Sec.*, No. 19-cv-8472, 2020 WL 6580778, at *3 (D.N.J. Nov. 10, 2020) (affirming ALJ's denial of benefits where the ALJ stated that he considered the combined effect of obesity with other severe impairments).

Prior to step four, obesity was properly considered during the ALJ's construction of the RFC. Tr. at 23–27. When determining the RFC, the ALJ explained:

> The claimant also alleges obesity as a contributing factor to her disability. While obesity, weight or BMI alone are not the criteria for determining disability, diagnosis does not, in most instances, equal disability; but must be considered in terms of how a medically determinable impairment, which is severe, is further impacted by the obesity. The obesity itself is not considered the disabling impairment, as many obese people are fully functional both mentally and physically. Treatment records noted the claimant stood 5' 6" tall and weighed 195 pounds with a BMI of 31.7. I have considered the effect of obesity on the claimant's other impairments in conjunction with Social Security Ruling 19.2. In combination with her other impairments and consistent with her testimony, obesity affects her exertional ability to the degree that she can do no more than sedentary work.

*Id.* at 25. The ALJ recognized that Plaintiff's obesity "[i]n combination with her other impairments" affected her exertional ability such that she was limited to sedentary work. *Id.* Having considered "all symptoms" (*id.* at 23), the ALJ specifically addressed her other physical limitations (*i.e.*, back and knee pain)—the areas where obesity is most likely to compound. *See Gainey v. Astrue*, No. 10-1912, 2011 WL 1560865, at *12 (D.N.J. Apr. 25, 2011) ("[W]here the ALJ has indicated that the impairments have been considered in combination, there is 'no reason not to believe' that the ALJ did so." (citation omitted)). The ALJ's specific consideration of obesity in the context of these physical findings, in addition to a thorough discussion of the medical evidence, satisfied his obligation to "meaningfully consider the effect of a claimant's obesity" in the context of constructing the RFC. *Diaz*, 577 F.3d at 504; *see also Hoyman v. Colvin*, 606 F. App'x 678, 680 (3d Cir. 2015) ("Here, the ALJ explicitly contemplated [claimant's] obesity at the appropriate step . . . . Accordingly, [claimant's] argument fails.").

The ALJ's assessment of obesity at step five was also sufficient. Objections to the ALJ's reliance on a vocational expert's testimony at step five can be framed in two ways:

> (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC

> assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety . . . are really best understood as challenges to the RFC assessment itself.

*Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005). If Plaintiff is attempting to argue that the ALJ's hypotheticals failed to properly convey the limitations to the vocational expert, that is unavailing, as the hypotheticals presented included a limitation of sedentary work. *See, e.g.*, Tr. at 78 ("The individual would be limited to sedentary work exertionally. . . ."). The ALJ explicitly stated in his opinion that the sedentary work limitation was imposed, at least in part, because of Plaintiff's obesity. *Id.* at 25 ("[O]besity affects her exertional ability to the degree that she can do no more than sedentary work."). Thus, the hypotheticals sufficiently conveyed limitations imposed because of Plaintiff's obesity. To the extent Plaintiff is challenging the RFC, the ALJ thoroughly explained that he considered the effect of Plaintiff's obesity in conjunction with Plaintiff's other impairments when formulating the RFC. *Id.* at 19–20 ("Claimant's limitations due to obesity are reflected in the below [RFC]."). As addressed herein, the RFC was based on substantial evidence in the record and Plaintiff's objection to the RFC is without merit. Additionally, at step five, the ALJ wrote that he considered Plaintiff's RFC—which incorporated a consideration of Plaintiff's obesity. *Id.* at 28; *see also Chandler v. Berryhill*, No. CV 16-4516, 2018 WL 3575258, at *4 (E.D. Pa. July 24, 2018) ("[W]hile the ALJ did not specifically discuss the impact of Plaintiff's obesity at step five, he explained that he considered the effect of Plaintiff's obesity in conjunction with Plaintiff's other impairments and in formulating the RFC."); *Lugo v. Colvin*, No. 13-7598, 2016 WL 2910104, at *3 (E.D. Pa. May 19, 2016) (collecting cases finding that meaningful consideration does not require the ALJ to adhere to a particular format or use "magic words"); *Muniz v. Astrue*, No. CIV.A. 11-7920, 2012 WL 6609006, at *4 (E.D. Pa. Dec. 19, 2012) ("To the extent that residual functional capacity is a determination based on

13

cumulative analysis of Plaintiff's impairments, it seems that the proper analysis could occur at step five without explicit use of the word 'obesity' so long as its effects were taken into consideration.").

Plaintiff's reliance on *Diaz* is unpersuasive. In *Diaz*, the ALJ identified obesity as a severe impairment, but offered no further explanation at the later sequential steps as to how obesity affected claimant's ability to function. 577 F.3d at 504–55. The Third Circuit held that the ALJ's "citation of reports by doctors who were aware of Diaz's obesity" was insufficient to provide for proper judicial review. *Id.* Notably, the Court stated that "[w]ere there *any* discussion of the combined effect of Diaz's impairments," the court could have properly reviewed the decision. *Id.* In this matter, as explained, the ALJ discussed Plaintiff's obesity specifically during each step of the sequential process. The ALJ explicitly stated he considered Plaintiff's obesity in combination with her other impairments. Tr. at 25 ("In combination with her other impairments and consistent with her testimony, obesity affects her exertional ability to the degree that she can do no more than sedentary work."). Therefore, the Court finds that the ALJ's explanation is sufficient to satisfy the standard set forth in *Diaz*.

Moreover, Plaintiff has not explained how further consideration of obesity would influence the ALJ's analysis. Plaintiff has not pointed to any evidence in the record indicating that obesity impacted her impairments such that the medical equivalency analysis would change or that she required additional RFC limitations due to her obesity. Mere speculation that obesity combined with other impairments necessitates more significant RFC limitations, or that it would have resulted in a different medical equivalency analysis, is inadequate. *See Cosme v. Comm'r of Soc. Sec.*, 845 F. App'x 128, 132 (3d Cir. 2021) (a "generalized response" that obesity would affect another impairment is insufficient); *Carter v. Comm'r of Soc. Sec.*, 805 F. App'x 140, 143 (3d Cir. 2020) (claimant must establish not just that "obesity *can* impair one's ability to perform

14

basic work activities," but must "specify[] *how* her obesity . . . affected her ability to perform basic work activities").

### 2. The ALJ's Evaluation of Plaintiff's Mental Impairments

Second, Plaintiff argues that the ALJ did not properly evaluate her mental impairments. Pl. Br. at 21–28.

The ALJ's obligation at step three is to determine whether a plaintiff has any impairments that meet or are medically equivalent to any of the listed impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The relevant mental impairments[2] are included in paragraph B, and under such, a plaintiff's functioning is evaluated in four areas: the ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(4).

Here, at step three, the ALJ evaluated Plaintiff's learning disorder, major depression, adjustment disorder with anxiety, and PTSD. Tr. at 21. The ALJ described in detail why Plaintiff's conditions do not meet the relevant Listings. For example, the ALJ stated:

> The claimant's affective disorder implicates listing 12.04 but does not meet it because there is no evidence of marked difficulties in at least two areas of mental functioning or one extreme difficulties in at least one area of mental functioning. . . . No medical source has opined that any of claimant's impairments are of equal severity, either.

*Id.* After similar explanations for each of the relevant Listings, the ALJ described his finding that Plaintiff had moderate limitations in each of the "paragraph B" categories due to her mental impairments. *Id.* at 22. Contrary to Plaintiff's argument that the ALJ did not consider her mental impairments in combination, the ALJ concluded: "The severity of the claimant's mental

---

[2] The mental impairments analyzed by the ALJ included listings 12.02 (neurocognitive disorder), 12.04 (depressive disorder), 12.06 (anxiety disorder), and 12.15 (trauma and stressor-related disorders).

15

impairments, considered singly *and in combination*, do not meet or medically equal the criteria of listings 12.02, 12.04, 12.06 and 12.15." *Id.* (emphasis added); *see also Gainey*, 2011 WL 1560865, at \*12.

Plaintiff also argues that the ALJ failed to consider whether Plaintiff could sustain mental functioning specifically in a work setting. Plaintiff appears to argue that some of the evidence the ALJ relied on, such as Plaintiff's ability to function within her home or during her daily activities, is not applicable to her ability to function in a work setting. Pl. Br. at 26–28. Plaintiff's argument is unavailing; the ALJ evaluated Plaintiff's mental functioning based on the evidence in the record. *Adrienne L. v. O'Malley*, No. 1:21-CV-20492, 2024 WL 208963, at \*13 (D.N.J. Jan. 19, 2024) ("It was also proper for the ALJ to consider other record evidence, including Plaintiff's daily life activities, when analyzing Dr. Brown's findings and the extent of Plaintiff's mental impairments."); *Newcomb v. Kijakazi*, No. 3:20-CV-01552, 2022 WL 178820, at \*9 (M.D. Pa. Jan. 18, 2022) (affirming ALJ's denial of benefits where, *inter alia*, the ALJ considered claimant's "activities of daily living, including caring for his young son, managing his own personal care, shopping, mowing, cooking, cleaning, and driving," and found that these activities "suggest that [the claimant] is capable of performing work activity on a sustained and continuous basis") (citations omitted)). Plaintiff's mental functioning outside of the workplace can be used as evidence of her ability to function in a work setting. *James R. v. Kijakazi*, No. CV 22-05030, 2023 WL 6389097, at \*8 n.12 (D.N.J. Sept. 30, 2023) ("Information about [their] daily functioning can help us understand whether [their] mental disorder limits one or more of these areas [of mental functioning]; and, if so, whether it also affects [their] ability to function in a work setting." (citing 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(F)(3)(b))). Further, Plaintiff has again failed to identify specific evidence or aspects of her mental impairments that would impact the ALJ's conclusion.

16

Therefore, substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairments at step three, and the ALJ's explanation of such was sufficient.

### 3. The ALJ's RFC Assessment

Lastly, Plaintiff argues that the ALJ did not adequately explain his assessment of Plaintiff's RFC and ignored the medical evidence when doing so. Pl. Br. at 28–38.

The responsibility for assessing and assigning a claimant's RFC rests solely with the ALJ, not with any particular medical source. 20 C.F.R. §§ 404.1527(d)(2)–(3), 404.1546(c); *see also Chandler,* 667 F.3d at 361. The ALJ reviews "all of the relevant medical and other evidence" in the record and resolves conflicts in the evidence in determining the plaintiff's RFC. 20 C.F.R. § 404.1545(a)(3). Further, the ALJ must "provide a 'clear and satisfactory explication' of the basis on which his determination rests." *Mays v. Barnhart*, 78 F. App'x 808, 812 (3d Cir. 2003) (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

Here, the ALJ conducted a thorough review of the relevant evidence of record and explained how he arrived at the RFC. The ALJ explicitly considered Plaintiff's testimony concerning her right knee injury, lower back pain, side effects, and other difficulties as a result of her symptoms. Tr. at 23–24. The ALJ determined that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consist with the medical evidence and other evidence in the record." *Id.* at 24. The ALJ also discussed the medical evidence, and explained how Plaintiff had a limited range of motion but full strength in the upper extremities; Plaintiff's symptoms improved with physical therapy; and that no major problems were reported. *Id.* The ALJ also considered the medical opinion evidence. He found Dr. Silikovitz's opinion that Plaintiff could manage her own funds persuasive. *Id.* at 26. The ALJ explained that he found the opinions of Drs. Bustos and Briski (as to the impact of Plaintiff's physical impairments) and the opinions of Drs. Eckhart and Flaherty (as to the impact of Plaintiff's

17

mental impairments) persuasive. *Id.* at 26–27. In favor of Plaintiff, however, the ALJ found that based on the entire record available to him, Plaintiff had *even greater* limitations than were indicated in the medical opinions. *Id.* at 26–27 (finding further limitations "in the use of the dominant hand" and "social interactions as she tends to isolate"). The Court, therefore, finds that the ALJ's RFC determination was supported by substantial evidence. *See, e.g.*, *Clark v. Kijakazi*, No. CV 22-1541, 2023 WL 7410995, at *1 n.1 (W.D. Pa. Nov. 9, 2023) (finding the ALJ's analysis of Plaintiff's testimony was supported by substantial evidence where the ALJ articulated reasons supporting her credibility determination).

Plaintiff argues that the ALJ did not define sedentary work in the RFC. Pl. Br. at 35–36. The ALJ, however, described sedentary work "as defined in 20 CFR 404.1567(a)," except to the extent he added further limitations. Tr. at 23. This definition is adequate. *Vargas v. Comm'r of Soc. Sec.*, No. 6:21-CV-353, 2022 WL 2607318, at *3 (M.D. Fla. July 8, 2022) ("To the extent Plaintiff claims that the ALJ did not define 'less than the full range of sedentary work,' the ALJ specifically references the C.F.R. that defines sedentary work.").

Further, Plaintiff argues that the ALJ did not explain why he limited Plaintiff to frequent use of her right hand rather than occasional or constant use. Pl. Br. at 35–36. The ALJ's decision, however, discussed the medical evidence regarding Plaintiff's right arm and hand pain. Tr. at 23–24 (describing Plaintiff's complaints of her inability to work because she could not "lift or use her right hand" and she had "numbness in the right hand"). Notably, the two agency medical consultants found Plaintiff capable of sedentary work with *no manipulative limitations*. *Id.* at 100, 117. After consideration of these opinions, the ALJ afforded *greater* limitation "in the use

18

of the dominant hand." *Id.* at 27.[3] Plaintiff also fails to identify any evidence that would support an even greater limitation than the one afforded by the ALJ.

Lastly, Plaintiff argues that the ALJ did not explain how he accounted for the effect of obesity on her COPD and asthma. Pl. Br. at 36. The ALJ, however, described that although Plaintiff had a "history of asthma requiring the use of an inhaler and albuterol nebulizer," there was "no evidence of hospital admissions or emergency room visits related to her asthma, COPD or breathing issues." Tr. at 25. As discussed, the ALJ stated that he considered Plaintiff's obesity with her other impairments, of which COPD and asthma are identified as such. *Id.* at 19. Additionally, Plaintiff has not shown that any evidence supports a finding that her obesity had an impact on her COPD and asthma, such that a greater limitation was necessary in the RFC. *See Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 765 (3d Cir. 2016) ("[Plaintiff] never points to specific medical evidence in the record to demonstrate that his obesity, in combination with other impairments, is sufficiently disabling."). Therefore, the Court is satisfied that the ALJ provided a sufficient explanation of the evidence, and how the evidence supported his RFC finding. *See, e.g.*, *Mays*, 78 F. App'x at 812.

**V.     CONCLUSION**

For the reasons above, the ALJ's decision is affirmed. An appropriate Order will follow.

**DATE:** March 26, 2024

                                                */s/ Claire C. Cecchi*
                                                **CLAIRE C. CECCHI, U.S.D.J.**

---

[3] Plaintiff also argues that the ALJ fails to consider the vocational expert's testimony that all jobs would be "in the high range of frequent" use of the upper extremities. Pl. Br. at 36; Tr. at 85. However, the vocational expert's testimony is consistent with the ALJ's finding that Plaintiff can "frequently use the dominant hand." Tr. at 23.